[No. H017643. Sixth Dist. Apr. 1, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
JESUS LAGUNA CORTES, Defendant and Appellant.

COUNSEL

Jimmie E. Tinsley, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attoreny General, Ronald A. Bass, Assistant Attorney General, Richard Rochman and Linda M. Murphy, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**WUNDERLICH, J.—**

### I. *Statement of the Case*

Defendant Jesus Laguna Cortes appeals from a judgment entered after the trial court found him guilty of aggravated sexual assault—forcible rape—of a child, continuous sexual abuse of a child, and causing a child pain or suffering. (Pen. Code, §§ 261, 269, 273a, subd. (a), 288.5, subd. (a).)[1] On appeal, defendant claims the court erred in admitting his statements to police because he did not waive his *Miranda*[2] rights. He claims the separate conviction for aggravated sexual assault must be reversed because (1) there is insufficient evidence it occurred outside the period of continuous sexual abuse, and (2) the prosecutor could not properly charge a separate offense that occurred one day after the alleged period of continuous sexual abuse. Last, he claims there is insufficient evidence he caused the victim pain or suffering likely to produce great bodily injury.

We find no merit to these claims and affirm the judgment.

### II. *Facts*

Until 1994, defendant lived with his wife, their 12-year-old daughter (the victim), and other family members. That year he moved out after a physical

---

[1] Unless otherwise specified, all further statutory references are to the Penal Code.

[2] *Miranda* v. *Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974].

fight with his wife. Nevertheless, defendant continued to visit his children, usually during the week and at night when his wife was at work.

The victim testified defendant told her that it was common for fathers and daughters to have sexual relations. One night, in mid-1994, defendant got into bed with her and touched her vagina. She resisted, and he slapped her. From then until at least the beginning of 1995, defendant touched her somewhere every time he was there, often daily. At times, he tore off her clothes and threw her against the wall.

In 1995, defendant started to have sexual intercourse with the victim. She testified that it began in early 1995 and continued through February 1996. Defendant promised her she could sing in his band if she had sex with him. He also said he would take her to Mexico to have an abortion if she got pregnant.[3] Although he said he would not bother her if she let him do it once, he continued to do it regularly, almost daily. She said that either he physically forced her to comply or threatened her if she did not. She did not tell anyone for fear he might kill her or her mother.

The victim testified that on Saturday, the day before police first came to her house, defendant had intercourse with her twice.[4] The first time was in the morning, when she was cleaning her mother's bedroom. Defendant came in, threw her on the bed, grabbed her hair, and forced her to have intercourse, saying he wanted her for himself. Later that day, about 2:00 p.m., defendant asked to have sex again before he left. She consented because she was afraid he would hit her and she wanted him to leave.

The next day, Sunday, defendant was angry at the victim because he had learned she had a boyfriend. He beat her and pulled her hair, pushed her against a dresser and onto the floor, and continued to beat her and hit her with wires. Her mother intervened, and when the police arrived, defendant fled. On Monday, defendant returned, but the victim locked him out of the house, and he left. The police came again, and the victim was taken to a shelter.

That day, Linda Richards, a nurse with sexual assault response team at Valley Medical Center, examined the victim. She had red streaking around her eye and lip, a cut inside her mouth, multiple bruises on her arms and an older bruise on one of her biceps. The victim also had reddened areas in her genital area and the vaginal opening, which, according to Richards, typically occurs in nonconsensual sexual intercourse.

---

[3]The victim did ultimately get pregnant and had an abortion but without defendant's assistance.

[4]The parties stipulated that police first came to her house on Sunday, February 18, 1996.

The victim told Richards that she last had intercourse on Saturday, February 17 around 2:00 p.m. The victim also told Richards that defendant tried to have intercourse with her the day before but she fought him off, sustaining some bruises.

The parties stipulated that when Officer Popenoe of the San Jose Police Department came to the house on Sunday, February 18, the victim had no apparent injuries and did not complain of any pain.

On February 22, 1996, Officer Henry Duran of the San Jose Police Department interviewed defendant. Defendant admitted that he had had sexual intercourse with the victim once. He then wrote a letter apologizing for his actions and asking for forgiveness.

Duran also interviewed the victim. She told him that defendant started molesting her in mid-1994, stopped for six months, and then started again. She said that he began to have sexual intercourse with her at the start of 1995 but most of this activity occurred between November 1995 and February 1996. She said she and defendant last had intercourse on Saturday, February 17 around 2:00 p.m. She said he threw her on the bed. She did not, however, mention any acts against her earlier that day or the day before.

III. *Miranda Waiver*

A. *Background*

On February 22, 1996, Officer Henry Duran of the San Jose Police Department interviewed defendant in Spanish. Duran advised defendant of his *Miranda* rights, reading them from a preprinted card. Duran testified that in response, defendant said, " 'Yes, I understand and I was told to talk to an attorney but I'm going to tell you the same thing I'm going to tell him'—or 'I'm going to tell you.' And then [defendant] asked me if I had the time he would tell me and then I told him [I had the time]." Thereafter, defendant discussed the charges against him and gave his story.

On cross-examination, Duran testified that after defendant clearly indicated he understood his rights, he asked defendant, " 'And having your rights in mind, do you wish to talk to me?' " Duran said defendant expressed no uncertainty about whether he should waive his rights or what the right thing to do was.

The interview was tape-recorded. Apparently defense counsel had it transcribed and translated. When shown the transcription, Duran opined that it

was a "good translation" and "pretty close" but "you lose a lot when you translate from Spanish to English, is what I feel."

Duran read excerpts of the transcription concerning what he and defendant said. After Duran asked if defendant wanted to talk to him, defendant said, " 'Well, I feel that according to—I don't know what is correct. I am going to tell you what they told me, I'm not going to tell you things that didn't. According to the boss, he was going to send me an attorney, right?' " Defendant also said, " 'According to my boss, where I work . . . was going to send me an attorney.' " " 'But anyway, what can I say? I can say for or against. I will tell you the same thing I will tell the attorney.' " Duran responded, " 'Uh-huh,' " and defendant said, " 'If you don't have any . . .' " at which point the tape apparently became unintelligible and then continued, " 'we can talk because I have nothing.' " Duran explained that last part as follows: "It's time, he's talking about time that's when he says, 'If you have the time, I will talk to you.' That's what he says, that's what I remember and that's what I wrote down."

### B. *Discussion*

■ The prosecution had to prove by a preponderance of evidence that defendant knowingly and voluntarily waived his *Miranda* rights. (*People* v. *Whitson* (1998) 17 Cal.4th 229, 248 [70 Cal.Rptr.2d 321, 949 P.2d 18]; see *Colorado* v. *Connelly* (1986) 479 U.S. 157 [107 S.Ct. 515, 93 L.Ed.2d 473]; *People* v. *Sims* (1993) 5 Cal.4th 405, 440 [20 Cal.Rptr.2d 537, 853 P.2d 992].) A valid waiver may be express or implied. (*People* v. *Whitson, supra,* 17 Cal.4th at p. 246.) Although it may not be inferred "simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained" (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 475 [86 S.Ct. at p. 1628]), it may be inferred where "the actions and words of the person interrogated" clearly imply it. (*North Carolina* v. *Butler* (1979) 441 U.S. 369, 373 [99 S.Ct. 1755, 1757, 60 L.Ed.2d 286].)

In determining whether a defendant waived his rights, the court must consider "the totality of the circumstances surrounding the interrogation." (*Fare* v. *Michael C.* (1979) 442 U.S. 707, 724-725 [99 S.Ct. 2560, 2572, 61 L.Ed.2d 197].) In *Moran* v. *Burbine* (1986) 475 U.S. 412 [106 S.Ct. 1135, 89 L.Ed.2d 410], the court identified two distinct components of the inquiry: "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the

consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. [Citations.] [¶] . . . [¶] . . . Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." (475 U.S. at pp. 421, 422-423 [106 S.Ct. at p. 1141], fn. omitted.)

On appeal, we accept the trial court's resolution of disputed facts and inferences, and its evaluation of credibility, if supported by substantial evidence. (*People* v. *Whitson, supra,* 17 Cal.4th at p. 248.)

Instructive here is *People* v. *Sully* (1991) 53 Cal.3d 1195 [283 Cal.Rptr. 144, 812 P.2d 163]. There, the defendant, a former police officer, gave a taped statement following his arrest. Before questioning, the defendant was advised of his rights. Asked if he understood them, he said he did. On appeal, our Supreme Court found a valid, albeit implied, waiver. (See also, e.g., *People* v. *Johnson* (1969) 70 Cal.2d 541, 556-558 [75 Cal.Rptr. 401, 450 P.2d 865, 43 A.L.R.3d 366], disapproved on another point in *People* v. *DeVaughn* (1977) 18 Cal.3d 889, 899, fn. 8 [135 Cal.Rptr. 786, 558 P.2d 872]; *People* v. *Davis* (1981) 29 Cal.3d 814, 823-826 [176 Cal.Rptr. 521, 633 P.2d 186]; *People* v. *Nitschmann* (1995) 35 Cal.App.4th 677, 680-683 [41 Cal.Rptr.2d 325].)

■ Here, the evidence supports the trial court's findings. Duran advised defendant of his rights, and defendant understood them. Defendant said he'd tell Duran whatever he would tell his attorney, if Duran had the time to listen, and then he voluntarily gave a taped interview. Moreover, there is no evidence of coercion or intimidation. Under the circumstances, the trial court properly concluded that defendant waived his rights.

Defendant asserts that because he spoke Spanish, "the risk of cultural misunderstanding [was] too great," and, given this circumstance, his various references to an attorney and what was "correct" do not reflect a knowing and voluntary waiver but "merely confused acquiescence." We are not persuaded.

Officer Duran testified that Spanish is his native language and that he is a certified bilingual officer. Thus, the "risk of cultural misunderstanding" was minimal or nonexistent. Moreover, Officer Duran testified that after hearing

the advisements, defendant did not indicate any uncertainty about them or ask whether waiving them was the correct thing to do. Defendant did not ask Duran to repeat or clarify the advisements; nor did he ask any questions about them.

Defendant's passing references to an attorney do not reflect a request or desire to consult with an attorney or even an interest in doing so. (Cf. *People v. Bestelmeyer* (1985) 166 Cal.App.3d 520 [212 Cal.Rptr. 605] [ambiguous reference to attorney not invocation of *Miranda* rights]; *People v. Johnson* (1993) 6 Cal.4th 1 [23 Cal.Rptr.2d 593, 859 P.2d 673] [reference to hiring attorney not invocation].) Moreover, the trial court did not infer uncertainty or confusion from these references, and they do not, in our view, compel a finding that defendant did not understand his rights when he voluntarily proceeded with the taped interview.

### IV. *Conviction for Aggravated Sexual Assault*

#### A. *Sufficiency of Evidence*

Defendant claims there is insufficient evidence to support a finding that he forcibly raped the victim on Saturday, February 17, 1996, as alleged. We disagree.

When considering a challenge to the sufficiency of the evidence to support a criminal conviction, we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; see also *Jackson* v. *Virginia* (1979) 443 U.S. 307, 319-320 [99 S.Ct. 2781, 2789-2790, 61 L.Ed.2d 560].) In making this determination, we do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses. (See *People* v. *Jones* (1990) 51 Cal.3d 294, 314 [270 Cal.Rptr. 611, 792 P.2d 643].)

"Although it is the duty of the [trier of fact] to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the [trier of fact], not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding

does not warrant a reversal of the judgment." ' " (*People* v. *Bean* (1988) 46 Cal.3d 919, 932-933 [251 Cal.Rptr. 467, 760 P.2d 996].)

We begin our analysis, however, with the undisputed fact, via stipulation, that police *first* came to the victim's house on Sunday, February 18, 1996, and that they returned the next day, Monday, February 19, 1996. As the People acknowledge, there was inconsistency and confusion in the victim's testimony.

On direct examination, the victim correctly testified that there was a weekend in February when the police came to her house twice. However, she said they first came on a Saturday, after her father had learned about her boyfriend and then assaulted her. He fled before the police got there. However, he returned the next day. She locked herself in the house and said she was going to kill herself. Her brother said he was going to call the police, and her father then left. The police arrived later, and the victim went to a shelter.

The victim elaborated on this second time police came, saying that at the time she had bruises and scratches on her face, arms, and legs. She said that defendant inflicted these injuries, throwing her to the ground, sitting on top of her, and punching her. When asked why he beat her, she said, "He just will tell me that he wanted for me to be his, like he wanted me to be his lady."

In response to questions from the court, the victim said both that she had sexual intercourse with defendant in February 1996 and that she did not remember if she did.

On redirect, the victim admitted telling Officer Duran that she had sex with defendant two days before the first time police came.

On recross-examination, the victim reiterated that she did not remember whether or not she had sex with defendant in February 1996 and was not sure of the date on which she had sex with him. However, she said it felt like every day. However, she then explained that the day police came, she and defendant had a fight because he found out about her boyfriend. She further testified that although she and defendant did not have sex on the day police came, they did have sex "the day before, on Saturday at 2:00 in the afternoon."

The court sought clarification, asking, "What happened on Saturday at 2 o'clock in the afternoon?" She replied, "He had his band and they were

going to play and he said that we should do it because he was going to leave." She then explained that "do it" meant having sexual intercourse. The court asked if it was against her will, and she said "yes."[5]

Continuing recross-examination, defense counsel asked whether the police came out the next day, Sunday, and whether that Sunday was the day she and defendant fought about her boyfriend but did not have sex. The victim agreed with this chronology. Seeking greater clarity, defense counsel asked, "So on Sunday after the argument with your dad, you did not have sex?" The victim agreed. Defense counsel then asked, "And as you recall, the last time that you had sex with your father was on Saturday, the day before?" The victim said "yes." The victim further explained that they had sex in her mother's bedroom, and at the time, her father did not know about her boyfriend.

The victim then said that she and defendant had sex twice on that Saturday, once in the morning and again at 2:00 in the afternoon before he left to play with the band. She said that in the morning he hit her and forced her to have sex, but in the afternoon, she complied because she wanted him to leave. After her father left that day, her boyfriend did come over.

On redirect, the victim again agreed that police first came on Sunday after defendant beat her. The next time they came was Monday, when she locked everyone, including defendant and the police, out of the house. She also explained that she had sex in the afternoon on Saturday because she wanted defendant to leave and was afraid he would hit her if she refused.

Last, we note that the victim told both the nurse who examined her at the hospital and Officer Duran that defendant raped her on February 17, 1996, at 2:00 p.m.

Although the victim gave inconsistent and conflicting testimony, it was not as a whole incapable of being believed. It was the trial court's function to resolve the inconsistencies and contradictions in her testimony, and, as noted, on appeal we resolve all inferences and inconsistencies in favor of the

---

[5]Defendant claims that in asking the victim questions, the trial court "went beyond the bounds of neutrality" and pressured the victim into supplying the answers he wanted to hear. We disagree. A trial judge may participate in the examination of witnesses whenever he or she believes doing so may fairly aid in eliciting the truth, in preventing misunderstanding, in clarifying the testimony or covering omissions, in allowing a witness his or her right of explanation, and in eliciting facts material to a just determination of the cause. (*People* v. *Hawkins* (1995) 10 Cal.4th 920, 948 [42 Cal.Rptr.2d 636, 897 P.2d 574].) Here, the victim was 14 years old at the time of trial, she testified via an interpreter, and, at times, her testimony was confused, ambiguous, and unclear. Under the circumstances, the court's participation in her examination was well within the proper exercise of its discretion.

trial court's findings. (*People* v. *Tewksbury* (1976) 15 Cal.3d 953, 962 [127 Cal.Rptr. 135, 544 P.2d 1335]; *People* v. *Harlan* (1990) 222 Cal.App.3d 439, 453-454 [271 Cal.Rptr. 653].)

Here, the victim's testimony reasonably supports the trial court's findings that defendant had forcible intercourse with the victim, that it occurred on a Saturday, and that it occurred the same weekend but the day before the police first came to her house on Sunday, February 18, 1996. In other words, there is sufficient evidence to support defendant's conviction for rape on February 17, as alleged.

### B. *Validity of Conviction for Aggravated Assault*

■ Defendant contends that charging him with both one count of continuous sexual abuse *and* a separate count of forcible rape violated section 288.5, subdivision (c). Thus, he claims the rape conviction must be reversed.

We first discuss section 288.5. That statute was passed in response to *People* v. *Van Hoek* (1988) 200 Cal.App.3d 811 [246 Cal.Rptr. 352]. In *Van Hoek*, the defendant was accused of molesting his daughter over a 10-year period. The victim gave generic testimony about the instances of abuse: the defendant's approach was about the same each time but the activity changed as she grew older. The victim could not, however, link any instance with a particular date or significant event. On appeal, the court held that the failure to allege and prove *specific acts of molestation* violated the defendant's right to due process because it deprived him a fair opportunity to prepare an adequate defense. (*Id.* at p. 818.) The court also found that the generic testimony and lack of specifics as to time and place made it impossible for the jury to *unanimously* agree upon any specific acts to support a conviction. (*Id.* at p. 816; accord, *People* v. *Atkins* (1988) 203 Cal.App.3d 15, 19 [249 Cal.Rptr. 863]; *People* v. *Luna* (1988) 204 Cal.App.3d 726, 746 [250 Cal.Rptr. 878]; *People* v. *Vargas* (1988) 206 Cal.App.3d 831, 845-846 [253 Cal.Rptr. 894].)

In enacting section 288.5, the Legislature stated, in an uncodified part of the legislation, that its intent is "to provide additional protection for children subjected to continuing sexual abuse and certain punishment for persons referred to as 'resident child molesters' by establishing a new crime of continuing sexual abuse of a child under circumstances where there have been repeated acts of molestation over a period of time, and the perpetrator either resides with or has recurring access to the child. It is the further intent of the Legislature that the penalty for this crime shall be greater than the maximum penalty under existing law for any single felony sex offense." (Stats. 1989, ch. 1402, § 1, p. 6138.)

Section 288.5 imposes stiff penalties of 6, 12, or 16 years on any person who lives with or who has recurring access to a minor under 14 and "who over a period of time, not less than three months in duration," commits three or more prescribed acts of sexual misconduct with the minor. In essence, the statute punishes repetitive activity as a *course of conduct*, defined as at least three acts over at least three months.[6] (See *People* v. *Whitham* (1995) 38 Cal.App.4th 1282, 1294 [45 Cal.Rptr.2d 571]; *People* v. *Gear* (1993) 19 Cal.App.4th 86, 92 [23 Cal.Rptr.2d 261]; *People* v. *Avina* (1993) 14 Cal.App.4th 1303, 1309 [18 Cal.Rptr.2d 511].)

By creating a course of conduct offense, the Legislature eliminated the due process and unanimity problems perceived in *Van Hoek*. (See *People* v. *Jones, supra,* 51 Cal.3d at p. 321 [generally, unanimity re specific acts not required for course-of-conduct crimes].) In particular, section 288.5, subdivision (b) of the statute provides, "To convict under this section the trier of fact, if a jury, need unanimously agree only that the requisite number of acts occurred not on which acts constitute the requisite number."[7]

Section 288.5, subdivision (c) (hereafter Subdivision (c)) is central to defendant's claim. It provides, in relevant part, "No other felony sex offense . . . may be charged in the same proceeding with a charge under this section unless the other charged offense occurred outside the time period charged under this section or the other offense is charged in the alternative. A defendant may be charged with only one count under this section unless more than one victim is involved in which case a separate count may be charged for each victim."

We turn now to defendant's claim. He concedes that the prosecutor literally complied with the terms of the statute. The information charged a single count of continuous abuse, alleging a period from June 1994 to February 16, 1996, during which at least three acts of molestation occurred. The information charged an additional rape charge on February 17, which is "*outside* the time period charged." (Subd. (c), italics added.) Nevertheless, defendant claims that literal compliance with Subdivision (c) is not enough.

---

[6]Section 288.5, subdivision (a), provides, in relevant part, that "[a]ny person who . . . has recurring access to [a minor child], who over a period of time, not less than three months in duration, engages in three or more acts of substantial sexual conduct with a child under the age of 14 years at the time of the commission of the offense, as defined in subdivision (b) of Section 1203.066, or three or more acts of lewd or lascivious conduct under Section 288, with a child under the age of 14 years at the time of the commission of the offense is guilty of the offense of continuous sexual abuse of a child and shall be punished by imprisonment in the state prison for a term of 6, 12, or 16 years."

[7]After section 288.5 was enacted, our Supreme Court in *People* v. *Jones, supra,* 51 Cal.3d 294, overruled *Van Hoek* and its progeny. (*Id.* at p. 322.)

Defendant asserts that the abuse did not end on February 16, as alleged, and then restart on February 17. Rather, the abuse that began in 1994 continued *through* February 17 and included the rape. Thus, defendant argues that given the *actual* period of continuous abuse, the prosecutor had no rational basis to distinguish February 16 from February 17, and, therefore, his decision to allege both a shortened period of abuse through February 16 and an additional offense the next day was "arbitrary and capricious."

Defendant further claims the prosecutor alleged an arbitrarily shortened period solely to circumvent the prohibition in Subdivision (c) against charging individual crimes committed *during* the period of continuous abuse. Defendant argues that the statute must be construed to prevent such circumvention, which undermines the purpose of the prohibition. Consequently, he urges us to construe Subdivision (c) to require that prosecutors allege the *entire* period of continuous sexual abuse shown by the evidence, if, as here, they seek convictions for continuous abuse *and* additional specific sexual offenses.[8]

As noted, the prosecutor complied with the statutory language. Thus, its plain meaning does not support defendant's claim. Indeed, the only explicit pleading requirement concerning the alleged period of abuse is that it be at least three months long. Defendant bases his claim not on the words of Subdivision (c) but rather on its underlying purpose.[9] We are not persuaded.

The prohibition against charging separate offenses committed during the alleged period of abuse is beneficial to defendants because it prevents multiple convictions for both a course of conduct and the acts that comprised it. Thus, Subdivision (c) mirrors the similar rule against convictions for both greater and lesser included offenses. (See *People* v. *Fields* (1996) 13 Cal.4th 289, 306 [52 Cal.Rptr.2d 282, 914 P.2d 832]; *People* v. *Pearson* (1986) 42 Cal.3d 351, 355 [228 Cal.Rptr. 509, 721 P.2d 595].)

---

[8]Although defendant's case involves a crime allegedly committed one day after the alleged period of abuse, his claim cannot reasonably be limited to his facts. For example, if the evidence revealed that the defendant regularly molested the victim every weekend and the prosecutor alleged a period of abuse and an additional offense the following weekend, the defendant could also argue that there was no basis to sever that last weekend from the preceding series of weekends comprising the alleged period of abuse.

[9]Although the words of the statute do not support defendant's claim, "[w]e are not prohibited 'from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute. The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. [Citation.] Literal construction should not prevail if it is contrary to the legislative intent apparent in the [statute]. . . .' " (*Lakin* v. *Watkins Associated Industries* (1993) 6 Cal.4th 644, 658-659 [25 Cal.Rptr.2d 109, 863 P.2d 179].)

Subdivision (c), however, must be viewed in relation to the rest of the statute. (See *Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299] [language understood in context of entire statute and not in isolation].) Section 288.5, subdivision (a) defines the crime of "continuous sexual abuse" in terms of its minimum requirements: at least three acts in no less than three months. For example, where a defendant commits the requisite three acts in three successive months, the crime is complete, and the defendant may be prosecuted and convicted. To this end, the prosecutor need only plead and prove those three acts in those three successive months. In other words, a prosecutor need only plead and prove the *minimum* period of time necessary to cover the requisite three acts. (See *People* v. *Hord* (1993) 15 Cal.App.4th 711, 720 [19 Cal.Rptr.2d 55].)

Viewing section 288.5, subdivision (a) and, Subdivision (c) together, we fail to see why prosecutors must allege any more than the *minimum* period of time necessary to prove the offense. Pleading the minimum clearly protects against multiple convictions for additional offenses committed during the course of criminal conduct *before* the crime was complete. By contrast, as we shall explain, requiring prosecutors to allege the *entire* period of continuous abuse shown by the evidence, that is, a period *longer* than necessary to prove the crime, leads to unreasonable, if not absurd, consequences that defeat the purpose of the statute.

For example, take persons who molested their victims every day for six months, two years, or ten years. According to defendant, the prosecutor would have to allege these entire periods because there is no basis to shorten them without being arbitrary. However, when the entire periods are alleged, Subdivision (c) shields the defendants from additional convictions for the countless acts they continued to commit *after* the first three months of abuse, long after their crimes of continuous abuse were *completed*. Thus, the pleading requirement urged by defendant would result in a benefit that *increased* the longer a molester continued to abuse his victim after the crime was completed. Moreover, by providing protection for the entire period of abuse, regardless of whether it lasts 10 years or 3 months, defendant's pleading requirement implies that the person who molests for 10 years is no more culpable than the person who does so for 3 months.

Defendant's view of Subdivision (c) is untenable. Instead of deterring continuous sexual abuse, his view encourages it to continue after the crime has been committed and thus fosters the very harm the statute was designed to prevent. That harm includes both the immediate injury from individual acts and a cumulative injury from their repetition. As abuse continues, its potential impact increases. (See *People* v. *Avina, supra,* 14 Cal.App.4th at p.

1311.) Thus, as the court in *People* v. *Hord, supra,* 15 Cal.App.4th 711 explained, "A defendant who . . . continues to perpetrate sexual abuse for a longer period of time than that required by section 288.5 is *more* culpable than a defendant who perpetrates the continued abuse for a limited time." (*Id.* at p. 720, italics added.) It follows that those who prolong periods of continuous abuse should be more, not less, vulnerable to additional convictions in order to ensure that their punishment can be commensurate with their culpability. Indeed, by permitting prosecutors to seek additional convictions for offenses committed *outside* the alleged period, the Legislature contemplated that a defendant may be convicted of both a course of sexual misconduct and individual sexual offenses against the same victim and thus clearly intended that liability reflect culpability. (*Ibid.*)

As noted Subdivision (c) also prohibits prosecutors from charging more than one count of continuous sexual abuse against the same victim. Thus, where the abuse lasted one year, a prosecutor may not seek convictions (and the stiffer punishments) for four counts by alleging four 3-month periods of abuse. However, given our analysis, this prohibition does not reasonably suggest that prosecutors must allege the entire period shown by the evidence. Rather, if the prosecutor alleges a shorter period than he or she could have, the prohibition simply requires that any additional allegations be for individual offenses.

Defendant claims that fundamental fairness militates in favor of requiring prosecutors to allege the entire period of abuse shown by the evidence. According to defendant, it is unfair for a prosecutor to benefit from the statutes' lesser burden of proof—the prosecutor can use generic testimony and the jury need not agree on the underlying acts—and not accept the statute's limitation: no additional convictions for acts committed during the period of continuous abuse.

We agree that under a common understanding of the phrase continuous sexual abuse, defendant molested the victim more or less continuously *through* February 17, 1996. The flaw in defendant's argument, however, is that the actual duration of his conduct is not controlling or necessarily relevant in determining the elements of the offense. Indeed, unless the prosecutor chooses to allege the entire period, that period has no independent legal significance under the statute.

Furthermore, in this case, defendant is hardly in a position to complain of unfairness or overzealous prosecution. The prosecutor alleged a period far longer than necessary to obtain a conviction under section 288.5. Thus, defendant avoided additional convictions for many more than the three acts

necessary to prove continuous sexual abuse. (Cf. *People* v. *Hord, supra,* 15 Cal.App.4th at p. 721.)

In sum, therefore, we hold that under section 288.5, a prosecutor need only allege the minimum period of time necessary to prove the elements of the offense. This view is consistent with the plain meaning of the statutory language, prevents multiple convictions for a course of conduct and the acts comprising it, and, most importantly, facilitates the protection of children from continuous sexual abuse.

Finally, we reject defendant's claim that the prosecutor acted arbitrarily and capriciously in severing a single day from an otherwise continuous course of sexual abuse. By this, defendant suggests that the prosecutor was guilty of discriminatory prosecution or otherwise abused his charging discretion. Such claims are meritless.

Defendant made no attempt below to show that he was "deliberately singled out for prosecution on the basis of some invidious criterion." (*Murgia* v. *Municipal Court* (1975) 15 Cal.3d 286, 298 [124 Cal.Rptr. 204, 540 P.2d 44].) Thus, he cannot claim discriminatory prosecution.

Understandably, defendant also cites no authority for the proposition that courts may review a prosecutor's decision concerning the type and number of crimes to charge for abuse of prosecutorial discretion. On the contrary, our state Constitution delegates the prosecutorial function to the executive branch, which is represented by the district attorney. (See Cal. Const., art. VI, § 20; Gov. Code, §§ 100, subd. (b), 26500; *People* v. *Tenorio* (1970) 3 Cal.3d 89, 95 [89 Cal.Rptr. 249, 473 P.2d 993]; *Esteybar* v. *Municipal Court* (1971) 5 Cal.3d 119, 127 [95 Cal.Rptr. 524, 485 P.2d 1140].) Moreover, under the doctrine of separation of powers, courts must scrupulously avoid interfering with the executive's prosecutorial function, including the exercise of its broad charging discretion. (See Cal. Const., art. III, § 3; *People* v. *Geiger* (1984) 35 Cal.3d 510, 529 [199 Cal.Rptr. 45, 674 P.2d 1303, 50 A.L.R.4th 1055]; *People* v. *Superior Court* (*Greer*) (1977) 19 Cal.3d 255, 262-263 [137 Cal.Rptr. 476, 561 P.2d 1164]; *People* v. *Ulibarri* (1965) 232 Cal.App.2d 51, 55 [42 Cal.Rptr. 409].)[10]

Even assuming such review were proper, the record does not support defendant's claim that the prosecutor's charging decision was arbitrary or

---

[10]We agree with the People, who argue "[a]dopting defendant's rationale would require judicial legislation to fix the number of days that would have to separate a period of continuous abuse and a chargeable felony sex offense." Thus, defendant would have us interfere not only with the executive branch but also with the Legislature.

capricious. The victim said defendant started fondling her vagina in mid-1994 and did so regularly thereafter for a few months; then in 1995, he started to have intercourse with her and continued doing so regularly until February 17, 1996. The victim also gave specific testimony that defendant raped her on February 17, 1996.

Given this information, the prosecutor could have charged a single count of continuous sexual abuse. However, since the duration of sexual abuse far exceeded the three months, and even during any *minimum* three-month period of his abusive acts, he committed more than the requisite three acts, the prosecutor apparently concluded that a single count of continuous abuse failed to provide liability commensurate with defendant's culpability and, therefore, increased liability was appropriate.

Given evidence showing a forcible rape on February 17, the prosecutor alleged a period of abuse through February 16 and the individual rape on February 17. Far from being arbitrary or capricious, the prosecutor's decision was manifestly reasonable, if not restrained. Moreover, as noted, defendant benefited from the prosecutor's decision to allege a period of abuse much longer than necessary to establish continuous sexual abuse.

## V. *Conviction for Causing Pain or Suffering*

■ Defendant contends there is insufficient evidence to support his conviction for causing the victim pain or suffering. (§ 273a, subd. (a).) We disagree.

For a defendant to be guilty of violating section 273a, subdivision (a), his conduct must be willful and it must be committed under circumstances "likely to produce great bodily harm or death." (See *People* v. *Lee* (1991) 234 Cal.App.3d 1214, 1221 [286 Cal.Rptr. 117].) "Great bodily harm refers to significant or substantial injury and does not refer to trivial or insignificant injury." (CALJIC No. 9.37.) However, there is no requirement that the victim suffer great bodily harm. (*People* v. *Jaramillo* (1979) 98 Cal.App.3d 830, 835 [159 Cal.Rptr. 771].)

Here, the victim, a 13-year-old girl, testified that she had black and blue marks from the defendant punching her, pushing her to the ground, getting on top of her, continuing to hit her and beating her with wire. Days after the attack, Linda Richards noted reddened areas around the victim's eye and lip, a cut inside her lip, and bruises on her right arm. This evidence is sufficient to support the trial court's finding on this charge. (Cf. *People* v. *Sanchez* (1982) 131 Cal.App.3d 718, 733 [182 Cal.Rptr. 671]; *People* v. *Covino* (1980) 100 Cal.App.3d 660, 667-668 [161 Cal.Rptr. 155].)

Defendant claims that the victim's testimony was impossible, noting inconsistencies and one officer's failure to observe injuries when he went to the house. Thus, defendant argues that there was no violation at all. If there were, however, he claims the evidence was insufficient to prove that any injury to the victim was inflicted under circumstances likely to produce great bodily injury.

Defendant merely reargues the evidence in a way more appropriate for trial than for appeal. Clearly, the trial court found the victim credible and resolved the conflicts in her testimony. (See *People* v. *Harlan, supra,* 222 Cal.App.3d at pp. 453-454.) Our review of the record does not compel a finding that as a matter of law her testimony was inherently incredible or impossible. Under the circumstances, we are bound by the trial court's determination. (See *People* v. *Mixon* (1990) 225 Cal.App.3d 1471, 1489 [275 Cal.Rptr. 817].)

### *Disposition*

The judgment is affirmed.

Bamattre-Manoukian, Acting P. J., and Mihara, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 14, 1999.