Filed 4/14/15  P. v. Guzman CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H039286 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1198262) |
| v. | |
| JONATHAN ISMAEL GUZMAN, | |
| Defendant and Appellant. | |

### STATEMENT OF THE CASE

A jury convicted defendant Jonathan Ismael Guzman of first degree murder (Pen. Code, §§ 187/189).[1]  The jury found true an allegation that defendant personally and intentionally discharged a firearm causing death (§ 12022.53, subd. (d)) and found true an allegation that defendant committed murder for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)).  The trial court sentenced defendant to a total prison term of 50 years to life, consisting of a term of 25 years to life for the murder and a term of 25 years to life for the firearm enhancement.  The trial court stayed the sentence on the gang enhancement.

---

[1] Subsequent unspecified statutory references are to the Penal Code.

Defendant now appeals from the judgment of conviction. On appeal, he contends that there was insufficient evidence to support the "primary activities" element of the gang enhancement. He also contends that his sentence is cruel and unusual punishment under *Miller v. Alabama* (2012) 567 U.S. ___,132 S.Ct. 2455 (*Miller*).

As set forth below, we conclude that the prosecution presented sufficient evidence in support of the gang enhancement, and we also conclude that defendant's sentence does not constitute cruel and unusual punishment. We therefore will affirm the judgment of conviction.

## STATEMENT OF THE FACTS

### The Shooting

At approximately 5:00 p.m. on January 21, 2011, Hugo Gutierrez rode a bicycle on Capitol Expressway in San Jose. Defendant, who was also riding a bicycle, followed Gutierrez. Defendant pointed a gun at Gutierrez and fired. Gutierrez got off his bicycle, ran toward a restaurant, and fell down outside the restaurant. Defendant jumped off his bicycle and walked toward Gutierrez. Gutierrez attempted to stand up, but he lost his footing. Gutierrez put up his hands in an effort to shield himself, and he screamed for help. Defendant began "rapidly firing" the gun at Gutierrez. Gutierrez was "just lying there" on the ground, and defendant fired multiple shots at him. Defendant then jumped on his bicycle and rode away.

Gutierrez suffered gunshot wounds on his chest, abdomen, arms, and legs. One of the bullets struck Gutierrez's heart, and it killed him.

### Gang Evidence

At the time of the shooting, defendant was a member of Kollmar Vago Trece (hereafter "KVT"), a Sureño street gang. Gutierrez was a member of Just Busting Funk (hereafter "JBF"), a Norteño street gang. There is a longstanding rivalry between Sureño gangs and Norteño gangs.

2

Gang Detective Carlos Garcia testified as an expert in "Hispanic criminal street gangs, specifically KVT." His expertise was based on the following: academic training regarding criminal street gangs; four and a half years of patrolling the streets of San Jose, including gang areas; contact and conversations with 250 gang members and affiliates, including KVT members; regular conversations with gang detectives and homicide detectives, including conversations regarding the operations of KVT; and conversations with agents from other law enforcement agencies.

Detective Garcia opined that, as of January 21, 2011, the primary activities of KVT were assaults with deadly weapons and firearms possession as prohibited by former section 12025. He explained that KVT members engaged in those activities "regularly" and on a "consistent basis," not just occasionally. His opinion regarding the primary activities of KVT was based on conversations with gang members, conversations with other law enforcement officials, and prior police documentation.

Detective Garcia described prior crimes committed by KVT members. On July 15, 2010, two KVT members were in a car, and they possessed a sawed-off shotgun and shotgun ammunition. A KVT member committed assault with a deadly weapon, a stabbing with a knife, on November 20, 2008. Detective Garcia explained that "violence is very important in the gang world," that gang members "must show a reputation of being violent and powerful," and that gangs gain power and respect through violence.

Detective Garcia opined that defendant killed Gutierrez for the benefit of KVT. He explained that Gutierrez was a Norteño gang member, and he was riding his bicycle in KVT territory. Gutierrez's conduct was the "ultimate form of disrespect in gang culture." Gang members retaliate against such disrespect with "public acts of violence." Defendant's "very public" act of violence increased KVT's power and influence because it showed that KVT members would "do whatever is necessary" to protect their territory.

3

## I. *Sufficiency of the Evidence*

Defendant contends that we must reverse the gang enhancement because there was insufficient evidence to establish the "primary activities" element of the enhancement. As explained below, we conclude that that the prosecution presented sufficient evidence in support of the gang enhancement.

### A. *Standard of Review*

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.) "The question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the underlying enhancement beyond a reasonable doubt." (*People v. Alvarez* (1996) 14 Cal.4th 155, 225, italics omitted.) "In making this determination, we do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses." (*People v. Cortes* (1999) 71 Cal.App.4th 62, 71.)

### B. *The Prosecution Presented Sufficient Evidence*

In order to prove the gang enhancement, the prosecution had to present substantial evidence establishing that KVT was a "criminal street gang." (§ 186.22, subd. (b)(1); *People v. Vy* (2004) 122 Cal.App.4th 1209, 1221 (*Vy*).) Section 186.22 defines that term as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or

4

symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).) "Therefore, the 'criminal street gang' component of a gang enhancement requires proof of three essential elements: (1) that there be an 'ongoing' association involving three or more participants, having a 'common name or common identifying sign or symbol'; (2) that the group has as one of its 'primary activities' the commission of one or more specified crimes; and (3) the group's members either separately or as a group 'have engaged in a pattern of criminal gang activity.' " (*Vy, supra,* 122 Cal.App.4th p. 1222.)

Here, Detective Garcia opined that the primary activities of KVT were assaults with deadly weapons and firearms possession in violation of former section 12025. Defendant does not dispute that those offenses are qualifying crimes enumerated in section 186.22, subdivision (e). Rather, he contends that there was insufficient evidence that KVT members consistently committed those crimes.

"The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. [Citation.] That definition would necessarily exclude the occasional commission of those crimes by the group's members." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.) "Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute. Also sufficient might be expert testimony . . . ." (*Id.* at p. 324, italics in original.) "[E]vidence of either past or present criminal acts listed in subdivision (e) of section 186.22 is admissible to establish the statutorily required primary activities of the alleged criminal street gang." (*Id.* at p. 323.) The jury may "consider the circumstances of the charged crimes on the issue of the group's primary activities." (*Id.* at p. 320.)

5

Contrary to defendant's assertion, the prosecution presented substantial evidence in support of the primary activities element of the gang enhancement. Detective Garcia opined that KVT members committed assaults with deadly weapons and committed firearms possession in violation of former section 12025 "regularly" and "on a consistent basis." He had an adequate basis upon which to base his opinion; his opinion was based on conversations with KVT members and members of other gangs, regular conversations with other law enforcement officials, and police documentation of KVT activities. (See *Vy, supra,* 122 Cal.App.4th p. 1223, fn. 9 [a gang expert may give opinion testimony that is based upon hearsay, including conversations with gang members and information the expert has learned from colleagues and law enforcement agencies].) Detective Garcia's opinion testimony was sufficient to establish the primary activities element of the gang enhancement. Other evidence, however, bolstered his opinion. The prosecution presented evidence of crimes committed by KVT members between 2008 and 2011: a stabbing in 2008, possession of a sawed-off shotgun in 2010, and defendant's use of a gun to kill Gutierrez in 2011. Detective Garcia also testified that "violence is very important in the gang world," and he explained that gang members must engage in violence in order to gain power and respect. The evidence of KVT's crimes between 2008 and 2011, combined with Detective Garcia's testimony regarding the importance and necessity of violence in gang culture, strongly suggested that KVT members consistently and repeatedly committed assaults with deadly weapons and possessed firearms in violation of former section 12025. Accordingly, based on the totality of the foregoing evidence, we conclude that there was sufficient evidence to support the primary activities element of the gang enhancement. (See *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1330 [sufficient evidence established the primary activities element where an expert testified that the gang's primary activities included offenses enumerated in section 186.22 and the charged offense was consistent with the expert's testimony].)

6

Defendant asserts that there was insufficient evidence to support the primary activities element because Detective Garcia "offered no evidence of the number" of times KVT members committed assaults with deadly weapons and possessed firearms in violation of former section 12025. Defendant emphasizes that Detective Garcia did not provide "meaningful numbers that would allow the jury to reach an informed conclusion." Defendant's argument is unconvincing. Defendant concedes that no authority requires an expert to state the specific number of times a gang has engaged in its primary activity. Moreover, although it might have been helpful to the jury if Detective Garcia had provided specific numbers, we cannot conclude that the such testimony was necessary here. As explained above, we believe that the totality of the evidence provided an adequate basis for the jury to conclude that KVT members consistently and repeatedly committed assaults with deadly weapons and possessed firearms in violation of former section 12025. We therefore must conclude that sufficient evidence supported the primary activities element of the gang enhancement.

## II. *Cruel and Unusual Punishment*

Defendant contends that his sentence of 50 years to life constitutes cruel and unusual punishment under *Miller, supra,* 567 U.S. ___, 132 S.Ct. 2455, and he accordingly requests that we remand the case for resentencing. Defendant's argument is premised on the notion that his sentence is the functional equivalent of life without parole (hereafter "LWOP"). As explained below, defendant has failed to show that his sentence constitutes cruel and unusual punishment.[2]

---

[2] We note that the California Supreme Court has granted review in two cases to consider whether a sentence of 50 years to life for a homicide committed while the defendant was a juvenile violates the Eighth Amendment: *People v. Franklin* (2014) 224 Cal.App.4th 296, review granted June 11, 2014, S217699 and *In re Bonilla* (2013) 220 Cal.App.4th 1232, review granted February 19, 2014, S214960.

7

In *Miller*, the United States Supreme Court held that "mandatory [LWOP] for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' " (*Miller, supra,* 132 S.Ct. at p. 2460.) *Miller* further held that a court that imposes LWOP on a juvenile offender must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Id.* at p. 2469, footnote omitted.) The *Miller* holding applies to a term-of-years sentence that is the functional equivalent of LWOP. (*People v. Argeta* (2012) 210 Cal.App.4th 1478, 1480-1482.)

Defendant was 17 years old when he committed the charged crime. He correctly notes that the trial court did not consider his youth when it sentenced him to 50 years to life. He has failed to show, however, that his sentence is the functional equivalent of LWOP.

Defendant contends that his sentence is the functional equivalent of LWOP because he becomes eligible for parole when he is 67 years old, and his life expectancy is 79 years.[3] This argument is unconvincing. Based on the numbers provided by defendant, he will have 12 years of life remaining when he becomes eligible for parole. *Miller* does "not apply to sentences which leave the possibility of a substantial life expectancy after prison." (*People v. Perez* (2013) 214 Cal.App.4th 49, 52.) A term-of-years sentence "with a parole eligibility date that falls outside the juvenile offender's natural life expectancy" is the functional equivalent of LWOP. (*People v. Caballero* (2012) 55 Cal.4th 262, 268.) A sentence is not the functional equivalent of LWOP if it provides the offender " 'with some realistic opportunity to obtain release' from prison during his or her expected lifetime." (*Ibid.*) Defendant's parole eligibility date falls well within his natural life expectancy, and he therefore has a realistic opportunity to obtain release

---

[3] Defendant cites data from the Centers for Disease Control for the proposition that his life expectancy is 79 years.

during his expected lifetime.  Defendant has thus failed to show that his sentence is the functional equivalent of LWOP, and we cannot conclude that his sentence runs afoul of *Miller*.

Finally, we briefly note that defendant has the opportunity to obtain release well before his 67th birthday.  Recently-enacted section 3051 mandates "youth offender parole hearings" at which the Board of Parole Hearings reviews "the parole suitability of any prisoner who was under 18 years of age at the time of his . . . offense."  (§ 3051, subd. (a)(1).)  A youth offender parole hearing "shall provide for a meaningful opportunity to obtain release."  (§ 3051, subd. (e).)  Under section 3051, defendant is entitled to a youth offender parole hearing during his 25th year of incarceration, when he is in early 40's.  (§ 3051, subd. (b)(3).)  Given that section 3051 provides defendant the opportunity to be released on parole when he is in his early 40's, it would strain credulity for us to conclude that his sentence is the functional equivalent of LWOP.  The enactment of section 3051 thus bolsters our conclusion that defendant's sentence is not cruel and unusual punishment within the meaning of *Miller*.

### DISPOSITION

The judgment is affirmed.

9

_____
RUSHING, P.J.

WE CONCUR:

_____
PREMO, J.

_____
MÁRQUEZ, J.